**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| CENTRI BUSINESS CONSULTING, LLC, <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH IANIERO, ELIZABETH IANIERO, and CORNERSTONE ACCOUNTING & ADVISORY, LLC, <br><br> Defendants. | ECF Case: <br><br> No.: _____ |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff, Centri Business Consulting, LLC ("Centri"), by and through its undersigned counsel, hereby files this Complaint for Damages and Injunctive Relief against Joseph Ianiero ("Joseph"), Elizabeth Ianiero ("Elizabeth"), and Cornerstone Accounting & Advisory, LLC ("Cornerstone," together with Joseph and Elizabeth, "Defendants") and in support thereof avers as follows:

### INTRODUCTION

1. This case is about a husband-and-wife team, Joseph and Elizabeth Ianiero, who, while collecting six-figure salaries from their employer, Centri, secretly built a competing business right under Centri's nose.

2. Over the course of at least seven months, Joseph (earning $176,500 per year) and Elizabeth (earning $129,500 per year) exploited the trust Centri placed in them, gained unauthorized access to Centri's protected computer

systems and storage facilities, documents, and confidential information and Trade Secrets (defined below), and systematically diverted Centri's clients, all to enrich themselves and their competing venture, Cornerstone.

3. The story begins at a dinner in May 2025, when Joseph and a former Centri co-worker, David Milas ("Milas"), first discussed the idea of striking out on their own.

4. Within weeks, the idea became a plan; within months, the plan became an operating business.

5. By July 2025, Cornerstone was formally registered, insured, and in Joseph's own words "officially live."

6. By September 2025, Joseph had secured a verbal commitment from a Centri client he was assigned to service ("Client A") to leave Centri and come to Cornerstone.[1]

7. By October 2025, Cornerstone had executed an engagement agreement with ProMedView, LLC ("ProMedView"), a prospective client that Joseph diverted from Centri.

8. By November 2025, Joseph was boasting that "Client B" was also "falling into our laps."

---

[1] For purposes of this Complaint, Centri has designated certain clients by pseudonym ("Client A," "Client B," and "Client C") to protect client confidentiality. Centri possesses the actual identities of these clients and will provide such information as appropriate during the course of this litigation.

9.   And by January 2026, Elizabeth had resigned from Centri to devote herself full-time to servicing Cornerstone's stolen client, Client A – while Joseph stayed on Centri's payroll as long as he could, collecting his salary for as long as the scheme remained undetected.

10.   This was not a case of employees merely planning to compete someday after leaving their jobs. Joseph and Elizabeth actively operated Cornerstone on Centri's clock and on Centri's dime.

11.   They downloaded Centri's confidential documents and templates to use as a foundation for Cornerstone. They used Centri's email systems to exchange Cornerstone business plans, logos, and strategy. They used Centri's QuickBooks subscription to perform accounting work for Cornerstone clients. They copied Centri's master services agreement – nearly word for word – to present to at least three clients and prospects.

12.   And when Centri's Vice President of Information Security sent a company-wide email about new document security procedures, Joseph and Milas laughed about it in a text message, joking that the email was probably directed at them since they had already ***"transferred all that shit to our Google drive."***[2]

---

[2] The full scope of what Joseph and Elizabeth took from Centri remains unknown. Centri's initial forensic review of their email accounts and device backups has already revealed a trove of evidence – executed engagement letters for Cornerstone clients stored on Centri's systems, ProMedView financial statements sent from Joseph's Cornerstone email to Elizabeth's Centri email, folders on Joseph's Centri OneDrive labeled with Cornerstone client names containing draft and executed agreements, and QuickBooks ledgers for Cornerstone clients generated using Centri's subscriptions.  In addition, as expanded upon below, since they made (intentionally) evasive representations in response to a pre-litigation cease-and-desist letter months ago, it has been

13. The documentary evidence of Defendants' misconduct is overwhelming. Joseph and Elizabeth left behind a comprehensive electronic trail – email threads, text messages, executed engagement letters, screenshots of shared business plans, forensic backup data, and admissions in sworn testimony obtained as part of a pre-litigation settlement with Milas – that establishes exactly what they did, when they did it, and how intentional it was.

14. In his sworn testimony, Milas confirmed that Joseph "was much more aggressive in his pursuit of starting [Cornerstone] and operating [Cornerstone]," that Joseph actively solicited at least three Centri clients (Client A, Client B, and Client C), and that Elizabeth resigned from Centri specifically "to service [Client A]" on behalf of Cornerstone.

15. Therefore, Centri brings this action for breach of the employee duty of loyalty, breach of contract related to non-solicitation and confidentiality obligations, violations of the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq.* ("FUTSA"), unfair competition, unjust enrichment, aiding and abetting, and tortious interference arising out of Defendants' scheme to steal Centri's clients and its confidential information and Trade Secrets, misuse Centri's resources, and siphon revenue and profits to their own competing business through their unlawful activities.

---

revealed that, while employed and for the benefit of their competing business – Cornerstone – Joseph and Elizabeth misappropriated rafts of files that contain confidential information and Trade Secrets belonging to Centri.

16.    In addition to compensatory damages and lost profits, Centri seeks disgorgement of the salary and benefits it paid to Joseph and Elizabeth during the months they were secretly competing against it, as well as a full accounting and disgorgement of all profits earned by Cornerstone from diverted clients and business opportunities, because employees who steal from their employers while collecting six-figure salaries are not entitled to keep the fruits of their disloyalty.

17.    Centri also seeks permanent injunctive relief, prohibiting Joseph and Elizabeth from further breaching their non-solicitation and confidentiality obligations and/or violating the FUTSA, as well as any effort(s) by Cornerstone to facilitate that happening.

## JURISDICTION, VENUE, AND THE PARTIES

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.    Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to this action occurred in this judicial district in Hillsborough County, Florida.

20.    Centri is a limited liability company with an address of Three Logan Square, 1717 Arch Street, 26th Floor, Philadelphia, Pennsylvania 19103.

21.    Centri is comprised of twelve members, none of whom is a citizen of Florida.

22.    Centri member Michael Aiello is an individual and a citizen of the Commonwealth of Pennsylvania.

23.    Centri member Michael Andrusko is an individual and a citizen of the Commonwealth of Pennsylvania.

24.    Centri member Gerald Cullins is an individual and a citizen of New Jersey.

25.    Centri member Tori Jancovic is an individual and a citizen of the Commonwealth of Pennsylvania.

26.    Centri member Derek Kearns is an individual and a citizen of Colorado.

27.    Centri member Jaime Krug is an individual and a citizen of the Commonwealth of Pennsylvania.

28.    Centri member Kevin McLaughlin is an individual and a citizen of the Commonwealth of Pennsylvania.

29.    Centri member Christopher Mora is an individual and a citizen of New Jersey.

30.    Centri member Stephan Parico is an individual and a citizen of the Commonwealth of Pennsylvania.

31.    Centri member Ryan Starkes is an individual and a citizen of North Carolina.

32.    Centri member Gerald Wik is an individual and a citizen of the Commonwealth of Pennsylvania.

33. Centri member Centri Holdings, LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, comprised of the following members: Michael Aiello, Gerald Cullins, Jaime Krug, Christopher Mora, Stephan Parico, Ryan Starkes, and Gerald Wik, all of whom, as alleged above, are citizens of Pennsylvania, New Jersey or North Carolina, and none of whom is a citizen of Florida.

34. Joseph is an individual who resides at 7304 S. Morton Street, Tampa, Florida 33616, and is a citizen of the State of Florida.

35. Elizabeth is an individual who resides at 7304 S. Morton Street, Tampa, Florida 33616, and is a citizen of the State of Florida.

36. Joseph and Elizabeth are married to each other.

37. Cornerstone is a limited liability company organized under the laws of the State of Florida with its principal address at 7304 S. Morton Street, Tampa, Florida 33616. Cornerstone has two members, Joseph and Elizabeth, each of whom is a citizen of the State of Florida. Cornerstone is, therefore, a citizen of the State of Florida for purposes of 28 U.S.C. § 1332.

**FACTS**

**A.** **Joseph and Elizabeth's Employment With Centri And Their Respective Contractual Obligations.**

38. Centri is a professional services firm that provides accounting and business advisory services, including financial reporting, technical accounting, mergers and acquisitions advisory, valuation, tax, and risk and compliance consulting to companies of all sizes across all industries.

39. Centri hired Elizabeth as an Experienced Associate effective September 6, 2022.

40. At the outset of her employment, Elizabeth executed an Offer Letter dated August 2, 2022. A true and correct copy of Elizabeth's Offer Letter is attached hereto as **Exhibit A.**

41. For the year 2025, Elizabeth earned an annual salary of $123,000, in addition to a total year-end bonus of $8,491.

42. At the start of January 2026, Elizabeth was earning an annual salary of $129,500 (exclusive of bonus opportunities).

43. Around the same time, Centri hired Joseph, Elizabeth's husband, for the role of Manager effective September 12, 2022.

44. Similarly, at the outset of Joseph's employment, Joseph executed an Offer Letter dated August 8, 2022.  A true and correct copy of Joseph's Offer Letter is attached hereto as **Exhibit B.**

45. For the year 2025, Joseph earned an annual salary of $163,000, in addition to a total year-end bonus of $11,963.

46. At the start of January 2026, Joseph was earning an annual salary of $176,500 (exclusive of bonus opportunities).

47. In each of their respective roles at Centri, Joseph and Elizabeth worked closely with Centri's clients to provide financial reporting, accounting, and consulting services.

48. For the sole purpose of performing their job duties, Joseph and Elizabeth were entrusted with access to significant confidential information belonging to Centri, including, but not limited to, customer lists, financial data, pricing models, and non-public information regarding Centri's products and services, as well as Centri's password-protected systems.

49. As set forth below, a subset of that confidential information includes Trade Secrets belonging to Centri.

50. Both Joseph and Elizabeth's Offer Letters contain identical restrictive covenant obligations.

51. Specifically, the Non-Compete/Non-Solicitation provisions of both Offer Letters, provide, in pertinent part:

> **Non-Compete/Non-Solicitation.** During the term of employment with [Centri] and for a period of two (2) years following the termination of Employee's employment with [Centri], the Employee shall not, directly or indirectly, without the prior written consent of [Centri], solicit or induce any employee or Consultant of [Centri] to leave the employ of [Centri]; or hire for any purpose any employee of [Centri]. ***The Employee will also not indirectly or directly, solicit or accept the business of any agent, Client or Customer of [Centri] or any known potential client of [Centri] with respect to services similar to those provided by [Centri] for the same two (2) year period.***

(Exs. A and B) (emphasis added).

52. In short, Joseph and Elizabeth were prohibited from soliciting or accepting business from any Centri clients or potential clients both during their employment and for a period of two (2) years after.

53.     The Offer Letters also contain Confidential Information and Non-Disclosure provisions that prohibited Joseph and Elizabeth from disclosing or utilizing Centri's "confidential information", defined in the Offer Letters to include "all trade secrets of [Centri] and its Clients and confidential information, and material of [Centri] and its Clients not generally known about their business." (*See* Exs. A and B).

54.     In addition to their Offer Letters, Joseph and Elizabeth both executed separate Confidentiality Agreements as a condition of their employment. True and correct copies of the Confidentiality Agreements are attached hereto as **Exhibits C and D.**

55.     The Offer Letters, as well as the Confidentiality Agreements, were executed in Florida and relate to Joseph and Elizabeth's employment in Florida.[3]

56.     The Confidentiality Agreements define "Confidential Information" to include "any information and data of any kind concerning any matters affecting or relating to including all trade secrets, business or operations, products, processes, or other data not generally known or available outside of the company of [Centri], agents, consultants, Clients or potential clients" as well as "internal reports,

---

[3] The Offer Letters contain a Pennsylvania choice of law provision, as well as a forum selection clause designating Pennsylvania as the jurisdiction in which litigation may be brought. However, the forum selection clause is subject to Centri's election. Centri elects to proceed in this forum and recognizes that, because: (i) the Offer Letters were executed in Florida and relate to Joseph's and Elizabeth's employment in Florida; and (ii) conflicts exist between Florida and Pennsylvania law as it relates to enforcing restrictive covenants, Florida law controls.

financials, client lists, methods of production, or other internal business-related communications."

57.    Under the Confidentiality Agreements, Joseph and Elizabeth agreed, *inter alia*, to not reproduce Centri's confidential information nor use it for any purpose other than for the benefit of Centri. (*See* Exs. C and D).

58.    Under the Confidentiality Agreement, Joseph and Elizabeth also agreed that they would "...upon request or upon termination of his/her relationship with [Centri], deliver any drawing, notes, documents, equipment, and materials received from [Centri] or its associates or originating from employment with [Centri]." (*Id.*).

59.    Despite their clear, unambiguous obligations to Centri, Joseph and Elizabeth brazenly violated those obligations by secretly competing against Centri during their employment, soliciting business for their competing business, Cornerstone, and both misusing and failing to return files that contain Centri's confidential information and Trade Secrets for their own benefit and the benefit of Cornerstone.

**B.    Joseph and Elizabeth Secretly Form Competing Business Cornerstone While Employed By Centri.**

60.    The scheme began to take shape in the spring of 2025, shortly after Joseph and Elizabeth's wedding in April 2025.

61.    In or around May 2025, while both Joseph and Elizabeth were still employed full-time by Centri, Joseph and another Centri co-worker, Milas, a fellow Centri manager, first raised the idea of pursuing an entrepreneurial venture.

62.     As Milas later confirmed under oath, the idea started as his, and the initial conversations took place over dinner with Joseph, Elizabeth, and Milas' wife.[4]

63.     Text messages between Joseph and Milas beginning in May 2025 reveal that the two agreed to form an entity together and divert Centri clients to their new venture.

64.     Throughout May and June of 2025, Joseph and Milas deliberated what they would call this new venture – M&I Financial, M&I Strategic Advisors, Cornerstone Financial Consultants – eventually agreeing on the name Cornerstone Accounting & Advisory, LLC.

65.     On or about June 28, 2025, Joseph and Milas purchased the domain "cornerstoneaccountingadvisory.com."

66.     Around the same time, Joseph created a document on Centri's systems titled: "Business Layout" which outlined a detailed to-do list, corporate set up plan, potential contacts, and a timeline for Cornerstone.

67.     Milas confirmed under oath that Joseph "put together the framework for building out Cornerstone" and that Joseph "was more aggressive in his pursuit of starting [Cornerstone] and operating [Cornerstone]."

68.     On July 9, 2025, Joseph and Milas e-mailed each other draft logos for Cornerstone using their Centri e-mail accounts.

---

[4] Despite Milas's involvement in the formation and early stages of Cornerstone, Centri reached a settlement with Milas prior to initiating this action, which Centri is permitted to disclose in any litigation against the Defendants.

69. Elizabeth also participated in the branding process, with Joseph texting Milas that he "was just showing Liz and she likes the black and gold" for the logo design.

70. On or about July 9, 2025, Cornerstone was formally registered with the Florida Secretary of State, approximately seven months before either Joseph, Elizabeth, or Milas separated from Centri.

71. On or about July 17, 2025, Joseph declared by text message to Milas: "Cornerstone is officially live!"

72. Joseph and Milas celebrated that Cornerstone was insured and operational.

73. Around the same time, Joseph and Milas began downloading Centri documents and confidential information, including work paper templates, engagement letter formats, and memoranda, to their personal systems in order to have a base set of documents to help Cornerstone become operational.

74. Milas admitted under oath that he personally downloaded Centri templates, including an intangible asset roll forward, a trial balance workbook, a 606 memorandum, and a business combination memorandum, all prepared on Centri templates.

75. Milas further testified that Joseph told him he "was going to take templates that he liked as well" and confirmed that Joseph "copied more over" on a subsequent day.

76. This is evidenced by an exchange between Joseph and Milas on July 21, 2025, brazenly joking that an e-mail from Centri's Vice President of Information Security informing Centri employees about a new document security procedure was directed at them since they had already downloaded an unknown amount of Centri documents.

77. By late August 2025, Joseph and Milas had Cornerstone business cards printed with their names, listing themselves as "Owners."

78. Milas testified that Joseph created the business cards "with Liz's help."

79. Joseph texted Milas a photo of the cards, exclaiming that he is "ready to network!"

80. At the same time, Elizabeth, while assisting Joseph in the background, debated whether she preferred the title of "owner" or "partner" of Cornerstone.

81. Milas testified that Joseph "basically told" him Elizabeth "was going to be part of the business" whether Milas liked it or not.

82. As Milas explained, he felt pushed out when "Liz ultimately was introduced as an owner and [he] really didn't have a say in whether she could be admitted or not."

83. Elizabeth was not a passive observer of this misconduct.

84. To the contrary, Elizabeth actively participated in Cornerstone's formation, branding, and operations while still employed by Centri: she weighed in on logo designs, helped create business cards, held herself out as an owner of

- 14 -

Cornerstone, obtained a Cornerstone email address (liz@csaccountingadvisory.com), participated in client transition calls, and was the person who ultimately resigned from Centri to devote herself full-time to servicing Client A on behalf of Cornerstone.

85. Milas testified under oath that the plan was for Elizabeth to be "the workhorse" or "the doer" while Joseph focused on networking and business development.

86. As detailed further below, the evidence confirms that Elizabeth did exactly that.

**C. Joseph Actively Solicits Centri Clients and Prospective Clients While Employed at Centri**

87. Beginning shortly after Cornerstone's formation and while Joseph was still employed by Centri, Joseph began aggressively soliciting Centri's clients to leave Centri and engage Cornerstone instead.

88. Under oath, Milas identified three Centri clients that Joseph actively solicited: (1) Client A; (2) Client B; and (3) Client C.

89. When asked whether Joseph reached out to these Centri clients while on the clock at Centri and pitched Cornerstone rather than Centri, Milas answered: "Yes."

90. Joseph's solicitation plan was initially thought out on August 7, 2025, when Joseph texted Milas stating: "Ok so thinking the plan should be let's try and land 2-3 clients outside of Centri first and then can start the move out. Thoughts?"

91.    Joseph went on, stating: "I think once we do that and get any residual clients from Centri that come with us we will be in good shape as a base."

92.    Joseph also began focusing his efforts on soliciting new, non-Centri clients to join Cornerstone and did so by attending networking events at least once a week to pitch only Cornerstone, not Centri.

93.    In fact, much of Joseph's networking occurred during normal business hours while Joseph was supposed to be performing work for Centri and collecting his six-figure salary.

94.    As Milas testified, he and Joseph had the same workload and title as managers, yet Milas had no bandwidth to network while Joseph somehow found time to attend events multiple times per week.

95.    When asked how Joseph could explain having so much time to network, Milas testified that it was "likely" because Joseph "was not providing his full-time and attention to his work at Centri."

96.    Around the same time, Centri had assigned Joseph to perform advisory services for a certain Centri client.

97.    Milas began to question how Joseph could adequately perform his job duties at Centri, and specifically, for the client account while aggressively networking on behalf of Cornerstone.[5]

---

[5] Q: And at any point, were you aware that Joe had neglected sort of his duties for [client] while he was busy working on the Cornerstone business? A: A lot of his networking occurred while he was working or assigned to [client], and as I previously testified, I often questioned how we could be able to get the work done.

- 16 -

98.    It became clear that Joseph began to neglect his Centri duties, specifically as certain clients complained to Centri management regarding Joseph overbilling for services that he was not providing.

99.    In response, Centri had to provide a discount of approximately $85,000 to make up for Joseph's wrongdoing and the resulting damage to Centri's client relationship.

100.    Milas could see that what started out as a joint venture between the two of them quickly turned into Joseph's project with Elizabeth's help.

101.    Milas testified that "[Joseph] was much more aggressive in his pursuit of starting [Cornerstone] and operating [Cornerstone]" and that Joseph was "full steam ahead, no hesitation" in soliciting Centri clients.

102.    On September 10, 2025, Joseph texted Milas: "Yo got some news for ya...Just got a verbal commitment from a client. [Client A] wants to come over, they are almost done getting series a funding and once done wants to refine process, revamp how they are doing things and grow/expand. They were like let us know when you want to move full time and we can do it."

103.    At that time, Client A was already an active Centri client.

104.    Joseph was the assigned Manager on the Client A account at Centri, which meant he had access to Client A's financials and other information, which Centri entrusted Joseph with.

105.    The next day, on Thursday, September 11, 2025, during business hours, Joseph e-mailed Client A's CEO and CFO/CCO from the e-mail address he

was assigned in connection with Client A's engagement with Centri, subject line: "Centri and Next Steps," with the following message:

> Hey Andrew,
> I've attached the Centri Agreement for your review. From a quick scan, it looks like it can be terminated at any time with a 30-day notice. As the month progresses, I'll be able to provide a more specific date for my transition to fulltime. In the meantime as we discussed, we can talk through the services and support expected to be needed, and work toward drafting a statement of work.
>
> Below are my contact details for Cornerstone Accounting & Advisory, including
> my email (CC'ed too) and cell number in case you need to reach me directly.
>
> Email: Joe@csaccountingadvisory.com
> Cell: 772-370-3554
>
> Looking forward to working together and helping you guys take the next step!
>
> Thanks,
> **Joe Ianiero, CPA**
> Controller

106. In the same e-mail thread, Joseph sent Client A a draft Statement of Work and continued to actively discuss next steps for Client A to engage Cornerstone directly, including exchanging draft agreements, confirming the process for notifying Centri, and coordinating the timing of the transition, all while Joseph remained employed by Centri.

107. In the same e-mail thread, Joseph misrepresented his contractual restrictions, telling Client A's CEO and CFO/CCO that he "never signed a non-

compete or anything like that" with Centri, so he had the go-ahead to move forward.

108. In fact, Joseph had signed an Offer Letter containing an enforceable non-solicitation provision, not to mention his confidentiality, statutory, and common law obligations.

109. Separately, on September 19, 2025, Joseph admitted to Milas that he is at lunch with a potential Cornerstone client and will be unable to attend a scheduled Centri call.

110. Joseph asked Milas to lead the call in his absence, assuring Milas that this networking lunch would help with "getting our name out there," prioritizing his competing business over his Centri obligations.

111. On October 27, 2025, Joseph texted Milas with another client opportunity: ProMedView.

112. Although ProMedView was not an active Centri client, Joseph affirmatively solicited ProMedView while working at Centri to divert its engagement to Cornerstone instead of Centri.

113. Joseph, as a trusted Manager and full-time employee of Centri, had an obligation to relay ProMedView as a business prospect to Centri rather than diverting the opportunity to Cornerstone.

114. On October 31, 2025, Cornerstone and ProMedView entered into an Accounting and Advisory Services Agreement to provide certain accounting and

advisory services – the same services that Centri would have provided ProMedView had Joseph brought them to Centri rather than Cornerstone.

115.   Notably, the ProMedView Accounting and Advisory Services Agreement follows, nearly word for word, the same structure and terms as Centri's standard Master Services Agreement ("MSA") that it uses for its own client engagements.

116.   This is consistent with Joseph's and Milas's earlier statements regarding their downloading of Centri's documents and confidential information and Trade Secrets in July 2025 for the purpose of facilitating Cornerstone's operations, thereby enabling Cornerstone to appropriate and repurpose an agreement developed by Centri, an established company, for use with Cornerstone clients and to benefit from Centri's work product.

117.   In November of 2025, Joseph texted Milas that "[Client B] and [Client A] are falling into our laps" and that he had "talked to [Client B] and they are on board with coming over…"

118.   Client B and Client A were both existing Centri clients.

119.   Milas confirmed under oath that Joseph solicited both Client B and Client C to leave Centri and come to Cornerstone, though Milas testified that, to his knowledge, neither had yet made the move.

120.   The fact that Joseph was simultaneously soliciting three different Centri clients while collecting his full salary from Centri underscores the breadth and brazenness of his disloyalty.

121. On December 21, 2025, Client A and Cornerstone entered into an Accounting and Advisory Services Agreement, which had an effective date of January 20, 2026, wherein Joseph signed on behalf of Cornerstone as an "Owner."

122. Again, Client A's agreement was essentially identical in language, structure, and terms as Centri's standard MSA.

123. After Client A executed its agreement with Cornerstone, Client A, with the direct help from Joseph, terminated its engagement with Centri.

124. Joseph, Elizabeth, and Cornerstone were uniquely positioned to solicit and undercut Centri.

125. Milas confirmed under oath that Joseph was already familiar with the services and pricing that Centri was providing its clients and could have created a new statement of work where he could provide the same services, but for cheaper, relying on confidential information he had access to through his employment at Centri.

126. This information, including Centri's pricing models, client lists, and engagement letter templates, was not publicly available.

127. As Milas acknowledged, he never "would have had access to that sort of template if it were not for [his] employment with Centri" and confirmed that such templates could not simply be found online.

**D.    Joseph and Elizabeth Misuse Centri Systems and Resources for Cornerstone**

128.    On January 10, 2026, while still employed by Centri and collecting his six-figure salary, Joseph sent financial statements for ProMedView from his Cornerstone e-mail address to Elizabeth's Centri e-mail address.

129.    This was not a one-time occurrence, as Centri's initial forensic review had identified additional transmissions, including Joseph using his Cornerstone email to send Elizabeth at her Centri email address ProMedView bank statements and financial data, which Elizabeth then processed using Centri's QuickBooks subscription.

130.    Both Joseph and Elizabeth then utilized Centri's QuickBooks subscription to perform services for ProMedView on behalf of Cornerstone.

131.    As outlined above, Joseph and Elizabeth used Centri's systems, email accounts, and resources to prepare a "to do list" outlining steps to form Cornerstone and solicit Centri clients, exchanged business ideas, strategy, and draft logos for Cornerstone using their Centri email accounts, and prepared engagement letters and statements of work for at least three clients and prospects on Centri's systems using Centri's documents.

132.    Throughout early January 2026, Joseph and Elizabeth scheduled meetings with Client A and other potential clients on both their Cornerstone and Centri e-mail accounts – again, while they were both fully employed at Centri.

133.    Clearly, Joseph and Elizabeth each used Centri's systems, e-mail accounts, and Centri's time to begin operating and luring away Centri's clients to

Cornerstone's competing business, all while leaving behind a comprehensive electronic record of their actions.

134. Joseph and Elizabeth treated Centri's resources as their own personal toolkit for building a competing business.

135. Joseph and Elizabeth did not attempt to hide what they were doing (or they failed to do so), segregate it from Centri resources, or even delete the evidence they were creating as they went.

136. The record now stands as unmistakable proof of deliberate, knowing misconduct perpetrated without remorse.

137. Just as an example, the below screenshots, alone, show how Joseph and Elizabeth felt no shame in using Centri resources for their own personal gain:





## E.   The Scope of the Conspiracy and Collaborative Scheme

138.   The text message thread between Joseph and Milas from June 2025 through February 2026 reveals the depth and breadth of the scheme.

139.   Over a period of approximately eight months (if not more), Joseph and Elizabeth, through Cornerstone, with their co-conspirator, exchanged hundreds of messages concerning: forming Cornerstone, purchasing domains and insurance, creating business cards, soliciting clients, designing logos and marketing materials, structuring fees and revenue-sharing, and celebrating their success in diverting business from Centri.

140.   As Joseph and Elizabeth began to aggressively pursue Cornerstone, they began to feel frustration with their co-conspirator, Milas.

141.   Joseph expressed his frustration with Milas not contributing enough to Cornerstone, stating: "Truthfully, I thought we both were going to be proactive and carve out time while working at Centri, trying to grow our networks, bringing business and build up the company, so we can do this full-time."

## F.   Post-Termination Conduct and Continued Operation of Cornerstone

142.   On January 23, 2026, Elizabeth resigned from her role at Centri.

143.   As Centri later learned, and what Milas confirmed under oath, Elizabeth resigned from her role at Centri specifically so that she could commit her full time to servicing Client A on behalf of Cornerstone.

144.   When asked why Elizabeth, rather than Joseph, was the one to resign, Milas testified that Joseph wanted to keep receiving his salary from Centri, "it would have been because of compensation," meaning Joseph intended to continue collecting his six-figure salary from Centri while simultaneously working for Cornerstone.

145.   Milas confirmed that both "Joe and Liz were servicing" Client A for Cornerstone at the time of Elizabeth's resignation.

146.   In light of Elizabeth's resignation, Centri looked further into her employment and e-mail accounts.

147.   It was then that Centri learned of the grand scheme between Joseph and Elizabeth, the creation of Cornerstone, and the multitude of e-mails, documents, communications, and solicitations on Centri's systems for the benefit of Cornerstone.

148. As a result, Centri terminated Joseph and Milas's employment on January 30, 2026.

149. Joseph had been employed by Centri for over three years and during at least the final seven months of his tenure, he was secretly operating a competing business while collecting his full compensation.

150. Elizabeth had resigned just days earlier, having been employed for a similar period, and was likewise collecting her full salary during the months she was helping build and grow Cornerstone.

151. Following their terminations, on February 2, 2026, Centri, through counsel, sent Joseph, Elizabeth, and Cornerstone a Cease & Desist Letter (the "C&D Letter"). A true and correct copy of the February 2, 2026 C&D Letter is attached hereto as **Exhibit E.**

152. The C&D Letter specifically demanded, among other things, the return of any and all Centri property, as well as any files, documents, work product, templates, client information, and other materials belonging to Centri.

153. In response to the C&D Letter, Joseph and Elizabeth confirmed that they are still operating Cornerstone with at least two active clients – Client A and ProMedView.

154. Joseph and Elizabeth's response also stated that they were in compliance with their "obligations" including "the return of all Centri property."

155. That was not true.

156. During Milas's deposition, Centri learned that Joseph and Elizabeth had taken actual Centri files and used those files to build and operate Cornerstone.

157. These files contain not just Centri's confidential information as defined in the Offer Letters and Confidentiality Agreements, but also Centri's trade secrets within the meaning of the FUTSA, which include Centri's non-public business, marketing, and client pitch strategies, valuation methodologies, terms related to Centri's client engagements, and financial due diligence PowerPoint presentations containing specialized calculations and work product compilations that bear a "Private and Confidential" disclosure on the first page and from which a competitor could discern and exploit Centri's methodologies (collectively, the "Trade Secrets").

158. Joseph and Elizabeth's disclosure makes clear that they not only improperly downloaded Centri files containing confidential information and Trade Secrets, but are still actively in possession of said files while operating Cornerstone.

159. By misappropriating these files, Joseph and Elizabeth gave Cornerstone an unfair competitive advantage, enabling a novice startup to instantly benefit from confidential information and Trade Secrets that took Centri years to develop, refine, and protect.

160. Furthermore, by exploiting their access to Centri's confidential pricing information, which is likewise encompassed within the definition of confidential information and Trade Secrets, both during their employment and through today, Defendants were able to undercut Centri.

161.    Despite brazenly misappropriating Centri's confidential information and Trade Secrets, Joseph and Elizabeth have not been shy about their continued operation of Cornerstone, proudly posting on LinkedIn on May 27, 2026:



## COUNT I
## BREACH OF THE EMPLOYEE DUTY OF LOYALTY
### (Centri v. Joseph and Elizabeth)

162.    Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

163. Under Florida law, employees owe a fiduciary duty of loyalty to their employers. *See OPS Int'l, Inc. v. Ekeanyanwu*, 672 F. Supp. 3d 1228, 1236 (M.D. Fla. 2023) ("an employee owes a fiduciary duty of loyalty to his or her employer not to 'engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment.'"); *see also Charles Schwab & Co. v. McMurry*, 2008 WL 5381922, at *1 (M.D. Fla. Dec. 23, 2008) ("[i]t is well established under Florida law that an employee owes a fiduciary duty and a duty of loyalty to his or her employer.").

164. Throughout their employment, Joseph and Elizabeth owed Centri a duty of loyalty, which required them to: (i) act solely for the benefit of Centri; (ii) refrain from competing with Centri during their employment; (iii) refrain from soliciting Centri's clients for the benefit of a competing venture; and (iv) refrain from using Centri's confidential information and/or resources for their own personal gain.

165. Joseph breached his duty of loyalty by, among other things: (a) secretly forming and operating Cornerstone, a directly competitive business; (b) actively soliciting at least one existing Centri client (Client A) to leave Centri and engage Cornerstone; (c) diverting the ProMedView business opportunity away from Centri and to Cornerstone; (d) utilizing Centri's confidential pricing information, systems, and resources to service Cornerstone clients; (e) using his position of trust to gain access to confidential information about Centri's clients

and pricing and using that information to undercut Centri; (f) neglecting his duties to Centri clients; and (g) billing time to Centri clients for work he did not perform.

166. Elizabeth breached her duty of loyalty by, among other things: (a) secretly forming and operating Cornerstone, a directly competitive business; (b) utilizing Centri's confidential pricing information, systems, and resources to service Cornerstone clients; and (c) using her position of trust to gain access to confidential information about Centri's clients and pricing and using that information to undercut Centri.

167. Joseph and Elizabeth's breaches of their duties of loyalty were knowing, intentional, willful, and malicious.

168. The electronic record left by Joseph and Elizabeth demonstrates a calculated, months-long scheme conducted without remorse and without regard for the basic obligations they owed to Centri as entrusted figures compensated with six-figure salaries.

169. Every dollar Joseph and Elizabeth earned from Centri during the months they were secretly building Cornerstone was a dollar stolen from Centri, and every hour they spent networking, soliciting clients, and servicing Cornerstone's clients was an hour Centri paid for but never received.

170. Disgorgement of Joseph and Elizabeth's salary and bonuses paid by Centri during the months they were in breach of their duty of loyalty to Centri are recoverable under Florida law. *See e.g., Therapies 4 Kids Inc v. Sobrino-Sanchez*,

2023 WL 6930482, at *4 (Fla.Cir.Ct. Aug. 07, 2023) (citing *ICMfg & Assocs., Inc. v. Bare Bd. Grp., Inc.*, 238 So. 3d 326, 338 (Fla. Dist. Ct. App. 2017)).

171.   As a direct and proximate result of Joseph and Elizabeth's breaches of their duties of loyalty, Centri has been damaged in an amount to be determined at trial.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against Joseph and Elizabeth and award Centri: (a) compensatory damages; (b) disgorgement of all compensation, salary, and benefits paid to Joseph and Elizabeth during the period of their disloyalty; (c) a full accounting and disgorgement of all profits earned by Joseph, Elizabeth, and/or Cornerstone from diverted clients and business opportunities; (d) lost profits; (e) punitive damages; (f) prejudgment and post-judgment interest; and (g) such other and further relief as this Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT (NON-SOLICITATION OBLIGATIONS)
### (Centri v. Joseph)

172.   Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

173.   Joseph executed an Offer Letter dated August 8, 2022 containing an enforceable non-solicitation covenant.

174.   Specifically, both during his employment and for a period of two years following the termination of his employment, Joseph agreed not to "directly or indirectly, solicit or accept the business of any agent, Client or customer of [Centri]

- 31 -

or any known potential client of [Centri] with respect to services similar to those provided by [Centri]." (*See* Ex. B).

175. The non-solicitation covenants in the Offer Letters are enforceable restrictive covenants under Florida law.

176. Florida Statute § 542.335 governs the enforceability of restrictive covenants and provides a framework for their enforcement where, as here, the covenants are supported by legitimate business interests including the protection of trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, and goodwill associated with the business.

177. Joseph breached his contractual non-solicitation obligations by, among other things: (a) soliciting Client A (an existing Centri client) to leave Centri and engage Cornerstone, beginning no later than September 2025 and continuing through January 2026; (b) accepting business from Client A on behalf of Cornerstone by executing an engagement letter with Client A effective January 20, 2026 and continuing to do business with Client A through today; (c) soliciting Client B and Client C, existing Centri clients, to leave Centri and engage Cornerstone; and (d) continuing to service diverted Centri clients through Cornerstone after the termination of his employment.

178. As a direct and proximate result of Joseph's breaches of his non-solicitation obligations, Centri has been damaged in an amount to be determined

at trial, including but not limited to lost profits, lost client relationships, and diminution of goodwill.

179.    Pursuant to Florida Statute § 542.335(1)(k), "[i]n the absence of a contractual provision authorizing an award of attorney's fees and costs to the prevailing party, a court may award attorney's fees and costs to the prevailing party in any action seeking enforcement of, or challenging the enforceability of, a restrictive covenant. A court shall not enforce any contractual provision limiting the court's authority under this section."

180.    Accordingly, Centri is entitled to an award of its reasonable attorneys' fees and costs incurred in this action.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against Joseph, and award Centri: (a) compensatory damages; (b) lost profits; (c) disgorgement of all profits earned by Joseph from solicited clients; (d) injunctive relief enforcing and prohibiting Joseph from any further violations of the restrictive covenants; (e) attorneys' fees and costs pursuant to Fla. Stat. § 542.335(1)(k); (f) prejudgment and post-judgment interest; and (g) such other and further relief as this Court deems just and proper.

**COUNT III**
**BREACH OF CONTRACT (NON-SOLICITATION OBLIGATIONS)**
**(Centri v. Elizabeth)**

181.    Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

182.    Elizabeth executed an Offer Letter dated August 2, 2022 containing an enforceable non-solicitation covenant.

183.    Specifically, both during her employment and for a period of two years following the termination of her employment, Elizabeth agreed not to "directly or indirectly, solicit or accept the business of any agent, Client or customer of [Centri] or any known potential client of [Centri] with respect to services similar to those provided by [Centri]." (*See* Ex. A).

184.    The non-solicitation covenant in Elizabeth's Offer Letter is an enforceable restrictive covenant under Florida law.

185.    Florida Statute § 542.335 governs the enforceability of restrictive covenants and provides a framework for their enforcement where, as here, the covenants are supported by legitimate business interests including the protection of trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, and goodwill associated with the business.

186.    Elizabeth breached her contractual non-solicitation obligations by, among other things: (a) soliciting Client A (an existing Centri client) to leave Centri and engage Cornerstone; (b) accepting business from Client A on behalf of Cornerstone and servicing Client A through Cornerstone beginning in January 2026 and continuing through today; and (c) continuing to service diverted Centri clients through Cornerstone after the termination of her employment.

187. As a direct and proximate result of Elizabeth's breaches of her non-solicitation obligations, Centri has been damaged in an amount to be determined at trial, including but not limited to lost profits, lost client relationships, and diminution of goodwill.

188. Pursuant to Florida Statute § 542.335(1)(k), "[i]n the absence of a contractual provision authorizing an award of attorney's fees and costs to the prevailing party, a court may award attorney's fees and costs to the prevailing party in any action seeking enforcement of, or challenging the enforceability of, a restrictive covenant. A court shall not enforce any contractual provision limiting the court's authority under this section."

189. Accordingly, Centri is entitled to an award of its reasonable attorneys' fees and costs incurred in this action.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against Elizabeth, and award Centri: (a) compensatory damages; (b) lost profits; (c) disgorgement of all profits earned by Elizabeth from solicited clients; (d) injunctive relief enforcing and prohibiting Elizabeth from any further violations of the restrictive covenants; (e) attorneys' fees and costs pursuant to Fla. Stat. § 542.335(1)(k); (f) prejudgment and post-judgment interest; and (g) such other and further relief as this Court deems just and proper.

**COUNT IV**
**BREACH OF CONTRACT (CONFIDENTIALITY OBLIGATIONS)**
**(Centri v. Joseph)**

190. Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

191. Joseph executed an Offer Letter dated August 8, 2022 containing enforceable confidential information and non-disclosure covenants.

192. Specifically, under the Offer Letter, Joseph agreed that he "at no time, either during or after Employee's employment with [Centri], disclose to any third party or utilize any of the 'Confidential Information' of [Centri], other than as necessary in the usual course of [Centri's] business and in the scope of Employee's employment, or except upon written consent of [Centri]." (*See* Ex. B).

193. Joseph also executed a Confidentiality Agreement containing enforceable confidential information and non-disclosure covenants.

194. Specifically, under the Confidentiality Agreement, Joseph agreed to, *inter alia*: (A) hold the confidential information (as defined in the Confidentiality Agreement) for Centri or its affiliates in strict confidence and to exercise a reasonable degree of care to prevent disclosure to others; (B) not disclose or divulge either directly or indirectly the confidential information to others unless first authorized to do so in writing by Centri's CEO; (C) not reproduce the confidential information nor use this information commercially or for any purpose other than the performance of his duties for Centri or its affiliates; and (D) upon request or upon termination of his relationship with Centri, deliver any drawings,

- 36 -

notes, documents, equipment, and materials received from Centri or its associates or originating from his employment with Centri. (*See* Ex. D).

195. The confidentiality covenants in Joseph's Offer Letter and Confidentiality Agreement are enforceable restrictive covenants under Florida law.

196. Florida Statute § 542.335 governs the enforceability of restrictive covenants and provides a framework for their enforcement where, as here, the covenants are supported by legitimate business interests including the protection of trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, and goodwill associated with the business.

197. Joseph breached his contractual confidentiality obligations by, among other things: (a) failing to hold Centri's confidential information and Trade Secrets in strict confidence by downloading proprietary documents, templates, work papers, and client information to personal devices and cloud storage accounts; (b) disclosing Centri's confidential information and Trade Secrets to Cornerstone and using it for Cornerstone's benefit without Centri's authorization; (c) reproducing Centri's confidential information and Trade Secrets, including engagement letter templates, financial due diligence PowerPoints, calculation methods, and client data, and using it commercially for the operation of Cornerstone; (d) failing to return Centri's confidential information upon termination of his employment, instead retaining hundreds of stolen files on a Google Drive that he continues to

use for Cornerstone's operations through today; and (e) using Centri's confidential information and Trade Secrets to gain an unfair competitive advantage over Centri.

198. As a direct and proximate result of Joseph's breaches of his confidentiality obligations, Centri has been damaged in an amount to be determined at trial, including but not limited to lost profits, lost client relationships, and diminution of goodwill.

199. Pursuant to Florida Statute § 542.335(1)(k), "[i]n the absence of a contractual provision authorizing an award of attorney's fees and costs to the prevailing party, a court may award attorney's fees and costs to the prevailing party in any action seeking enforcement of, or challenging the enforceability of, a restrictive covenant. A court shall not enforce any contractual provision limiting the court's authority under this section."

200. Accordingly, Centri is entitled to an award of its reasonable attorneys' fees and costs incurred in this action.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against Joseph, and award Centri: (a) compensatory damages; (b) lost profits; (c) disgorgement of all profits earned by Joseph from use of confidential information; (d) injunctive relief enforcing and prohibiting Joseph from any further violations of the restrictive covenants; (e) attorneys' fees and costs pursuant to Fla. Stat. § 542.335(1)(k); (f) prejudgment and post-judgment interest; and (g) such other and further relief as this Court deems just and proper.

## COUNT V
## BREACH OF CONTRACT (CONFIDENTIALITY OBLIGATIONS)
### (Centri v. Elizabeth)

201. Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

202. Elizabeth executed an Offer Letter dated August 2, 2022 containing enforceable confidential information and non-disclosure covenants.

203. Specifically, under the Offer Letter, Elizabeth agreed that she "at no time, either during or after Employee's employment with [Centri], disclose to any third party or utilize any of the 'Confidential Information' of [Centri], other than as necessary in the usual course of [Centri's] business and in the scope of Employee's employment, or except upon written consent of [Centri]." (*See* Ex. A).

204. Elizabeth also executed a Confidentiality Agreement containing enforceable confidential information and non-disclosure covenants.

205. Specifically, under the Confidentiality Agreement, Elizabeth agreed to, *inter alia*: (A) hold the confidential information (as defined in the Confidentiality Agreement) for Centri or its affiliates in strict confidence and to exercise a reasonable degree of care to prevent disclosure to others; (B) not disclose or divulge either directly or indirectly the confidential information to others unless first authorized to do so in writing by Centri's CEO; (C) not reproduce the confidential information nor use this information commercially or for any purpose other than the performance of her duties for Centri or its affiliates; and (D) upon request or upon termination of her relationship with Centri, deliver any drawings,

- 39 -

notes, documents, equipment, and materials received from Centri or its associates or originating from her employment with Centri. (*See* Ex. C).

206. The confidentiality covenants in Elizabeth's Offer Letter and Confidentiality Agreement are enforceable restrictive covenants under Florida law.

207. Florida Statute § 542.335 governs the enforceability of restrictive covenants and provides a framework for their enforcement where, as here, the covenants are supported by legitimate business interests including the protection of trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, and goodwill associated with the business.

208. Elizabeth breached her contractual confidentiality obligations by, among other things: (a) retaining Centri's confidential information and Trade Secrets after termination of her employment on a Google Drive that she continues to use for Cornerstone's operations through today; (b) using Centri's confidential information and Trade Secrets for Cornerstone's benefit without Centri's authorization, including to service Client A and ProMedView; (c) using Centri's systems, including Centri's QuickBooks subscription, to perform work for Cornerstone clients; and (d) using Centri's confidential information and Trade Secrets to gain an unfair competitive advantage over Centri.

209. As a direct and proximate result of Elizabeth's breaches of her confidentiality obligations, Centri has been damaged in an amount to be

determined at trial, including but not limited to lost profits, lost client relationships, and diminution of goodwill.

210.   Pursuant to Florida Statute § 542.335(1)(k), "[i]n the absence of a contractual provision authorizing an award of attorney's fees and costs to the prevailing party, a court may award attorney's fees and costs to the prevailing party in any action seeking enforcement of, or challenging the enforceability of, a restrictive covenant. A court shall not enforce any contractual provision limiting the court's authority under this section."

211.   Accordingly, Centri is entitled to an award of its reasonable attorneys' fees and costs incurred in this action.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against Elizabeth, and award Centri: (a) compensatory damages; (b) lost profits; (c) disgorgement of all profits earned by Elizabeth from use of confidential information; (d) injunctive relief enforcing and prohibiting Elizabeth from any further violations of the restrictive covenants; (e) attorneys' fees and costs pursuant to Fla. Stat. § 542.335(1)(k); (f) prejudgment and post-judgment interest; and (g) such other and further relief as this Court deems just and proper.

**COUNT VI**
**VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT, FLA. STAT. § 688.001, *et seq.***
**(Centri v. Defendants)**

212.   Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

213. As defined herein, Centri's Trade Secrets constitute "trade secrets" within the meaning of the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.002(4), because: (a) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) the information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

214. Centri's Trade Secrets derive independent economic value from not being generally known because they represent years of investment in developing proprietary calculation methods, business strategies, client relationships, pricing models, and specialized financial due diligence processes that give Centri a competitive advantage in the marketplace.

215. Competitors, including Cornerstone, could not have developed or obtained this information without significant time, effort, and expense.

216. Joseph knowingly, willfully, and maliciously misappropriated Centri's Trade Secrets by: (a) acquiring Centri's Trade Secrets through improper means, including downloading proprietary documents, templates, work papers, calculation methods, client financial information, and financial due diligence PowerPoints to personal devices and cloud storage while still employed by Centri; (b) disclosing Centri's Trade Secrets to Cornerstone without Centri's express or implied consent; (c) using Centri's Trade Secrets for Cornerstone's commercial benefit, including to prepare engagement letters, statements of work, and client

deliverables; and (d) retaining Centri's Trade Secrets after termination of his employment and continuing to use them to operate Cornerstone in direct competition with Centri.

217. Elizabeth knowingly, willfully, and maliciously misappropriated Centri's Trade Secrets by: (a) disclosing Centri's Trade Secrets to Cornerstone without Centri's express or implied consent by receiving and processing confidential client financial information through her Centri email and systems for Cornerstone's benefit; (b) using Centri's Trade Secrets for Cornerstone's commercial benefit, including to service Client A and ProMedView, prepare client deliverables, and perform accounting work using Centri's QuickBooks subscription; and (c) retaining Centri's Trade Secrets after the termination of her employment on a Google Drive that she continues to use for Cornerstone's operations through today.

218. Cornerstone is the entity that presently possesses the Google Drive containing Centri's Trade Secrets and is actively using those materials in its ongoing business operations.

219. As the company formed and controlled by Joseph and Elizabeth, Cornerstone is charged with the knowledge its members obtained during their employment with Centri and through their improper acquisition of Centri's Trade Secrets.

220.    Accordingly, Cornerstone's continued possession and commercial use of Centri's Trade Secrets constitutes willful and malicious misappropriation under FUTSA.

221.    Centri took reasonable steps under the circumstances to maintain the secrecy of its Trade Secrets, including but not limited to: (a) requiring employees, including Joseph and Elizabeth, to execute Offer Letters and Confidentiality Agreements containing non-disclosure obligations as a condition of employment; (b) limiting access to confidential client information, pricing models, and proprietary documents to employees who required such access to perform their job duties; (c) maintaining password-protected computer systems and requiring employees to use company-issued devices; (d) implementing document security procedures; (e) marking sensitive documents, including financial due diligence PowerPoints, as "Private and Confidential"; and (f) promptly demanding the return of all confidential materials upon Joseph and Elizabeth's termination of employment.

222.    As a result of the knowing, willful, and malicious acts of Joseph and Elizabeth, Centri has suffered and will continue to suffer actual damages.

223.    Defendants' misappropriation was willful and malicious, as evidenced by: (a) their deliberate downloading of Centri files to personal devices and cloud storage while still employed by Centri; (b) Joseph's text messages joking about Centri's IT security procedures and acknowledging he had "transferred all that shit" to his personal device; (c) their continued retention and use of Centri's trade

secrets after termination; and (d) their production of hundreds of stolen files months later, confirming they had knowingly retained the misappropriated materials.

224. Pursuant to Fla. Stat. § 688.003, Centri is entitled to injunctive relief to prevent actual or threatened misappropriation of its Trade Secrets, including an order prohibiting Defendants from using, disclosing, or retaining Centri's Trade Secrets in any manner.

225. Pursuant to Fla. Stat. § 688.004(2), because Defendants' misappropriation was willful and malicious, Centri is entitled to exemplary damages in an amount not exceeding twice the compensatory damages awarded.

226. Pursuant to Fla. Stat. § 688.005, Centri is entitled to an award of its reasonable attorneys' fees incurred in this action because Defendants' misappropriation was willful and malicious.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against Joseph, Elizabeth, and Cornerstone, and award Centri: (a) compensatory damages; (b) lost profits; (c) exemplary damages pursuant to Fla. Stat. § 688.004(2); (d) disgorgement of all profits earned by Defendants from solicited clients; (e) injunctive relief: (i) prohibiting Defendants from possessing, using, copying, and/or disclosing Centri's Trade Secrets in any way; and (ii) requiring Defendants to submit to a forensic examination and remediation of their personal devices, email accounts, and cloud storage to ensure compliance with the preceding (e)(i); and (f) attorneys' fees and costs, including without limitation

forensic imaging fees; (g) prejudgment and post-judgment interest; and (h) such other and further relief as this Court deems just and proper.

## COUNT VII
## UNFAIR COMPETITION
### (Centri v. All Defendants)

227. Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

228. This Count is pled in the alternative to Count VI to the extent the information at issue is determined not to constitute a Trade Secret, and otherwise rests on conduct independent of any misappropriation of Centri's Trade Secrets, Defendants engaged in unfair competition by systematically using Centri's confidential and proprietary information, including client lists, pricing models, engagement letter templates, and knowledge of client relationships, to form and operate a directly competing business, solicit Centri's clients, and divert business opportunities away from Centri.

229. Defendants' unfair competitive conduct includes: (a) using Centri's confidential pricing information to undercut Centri's fees and lure Centri's clients to Cornerstone; (b) presenting Centri's existing engagement agreements to prospective clients alongside Cornerstone's competing proposals to facilitate the transition; (c) utilizing Centri's proprietary systems and resources, including email, QuickBooks, and other subscriptions, to perform services for Cornerstone clients and to prepare engagement letters, statements of work, and marketing materials for Cornerstone while still employed at Centri; and (d) leveraging the

trust and client relationships that Joseph and Elizabeth developed solely through their employment with Centri to benefit Cornerstone.

230. Cornerstone directly participated in and benefited from the unfair competitive practices by accepting and profiting from diverted clients and business opportunities, and by operating as the vehicle through which Joseph and Elizabeth channeled the fruits of their misconduct.

231. Defendants' conduct was intentional, willful, and undertaken in bad faith and with full knowledge that Joseph and Elizabeth owed duties of loyalty and contractual obligations to Centri.

232. As a direct and proximate result of Defendants' unfair competition, Centri has been damaged in an amount to be determined at trial, including but not limited to lost profits, lost client relationships, damage to goodwill, and unjust enrichment of Defendants.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against all Defendants, and award Centri: (a) compensatory damages; (b) disgorgement of all profits earned by Defendants through their unfair competitive practices, including all revenue from clients and business opportunities diverted from Centri; (c) punitive damages; (d) a full accounting of all revenue and profits earned by Cornerstone; (e) prejudgment and post-judgment interest; and (f) such other and further relief as this Court deems just and proper.

## COUNT VIII
## UNJUST ENRICHMENT
## (Centri v. All Defendants)

233. Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

234. Defendants have been unjustly enriched at Centri's expense by obtaining and retaining benefits derived from Centri's proprietary information, confidential documents, systems, resources, and client relationships without Centri's consent and through wrongful conduct.

235. Specifically, Defendants were enriched by: (a) acquiring and using Centri's confidential pricing information, client lists, engagement letter templates, and proprietary work product to solicit clients and generate revenue for Cornerstone; (b) exploiting Centri's systems, including email, QuickBooks, and other subscriptions, to perform work for Cornerstone clients while Joseph and Elizabeth were being paid by Centri; (c) diverting clients and business opportunities, including Client A and ProMedView, from Centri to Cornerstone; (d) collecting salaries and benefits from Centri during the months Joseph and Elizabeth were secretly building and operating Cornerstone; and (e) retaining and continuing to use Centri's confidential documents stored on Cornerstone's Google Drive to operate a competing business.

236. Cornerstone, as the entity that received and continues to hold the revenue generated from diverted clients and business opportunities, and as the

entity that possesses and uses Centri's confidential information, has been directly enriched by Defendants' wrongful conduct.

237. Joseph and Elizabeth have been enriched by: (a) the salaries and benefits they received from Centri during the period of their disloyalty; (b) their ownership interests in Cornerstone; and (c) the profits and distributions they have received or will receive from Cornerstone's operations.

238. Defendants voluntarily accepted and retained the benefits conferred upon them, and they knew or should have known that such benefits were obtained through improper means and at Centri's expense.

239. Under the circumstances, it would be inequitable for Defendants to retain the benefits they obtained at Centri's expense without paying the value thereof to Centri.

240. As a direct and proximate result of Defendants' unjust enrichment, Centri has been damaged in an amount to be determined at trial.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against all Defendants, and award Centri: (a) disgorgement of all benefits unjustly obtained by Defendants, including all revenue and profits earned by Cornerstone from diverted clients and business opportunities; (b) disgorgement of all salary and benefits paid to Joseph and Elizabeth during the period of their disloyalty; (c) a full accounting of all revenue, profits, and distributions received by Defendants; (d) prejudgment and post-judgment interest; and (e) such other and further relief as this Court deems just and proper.

## COUNT IX
### AIDING AND ABETTING BREACH OF DUTY OF LOYALTY
(Centri v. Cornerstone)

241. Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

242. As set forth in Count I, Joseph and Elizabeth owed Centri a duty of loyalty during the course of their employment, and they breached that duty by, among other things, secretly forming and operating Cornerstone, soliciting Centri's clients, misusing Centri's resources, and diverting business opportunities to Cornerstone.

243. Cornerstone had actual knowledge of Joseph and Elizabeth's duties of loyalty to Centri.

244. Cornerstone was formed, operated, and controlled by Joseph and Elizabeth, who had direct and personal knowledge of their contractual and fiduciary obligations to Centri.

245. Cornerstone knowingly and substantially assisted Joseph and Elizabeth in breaching their fiduciary duties by: (a) providing the vehicle and corporate structure through which Joseph and Elizabeth carried out their disloyal conduct; (b) accepting and profiting from clients and business opportunities diverted from Centri, including Client A and ProMedView; (c) executing engagement agreements with clients that were solicited in breach of Joseph and Elizabeth's duties of loyalty; and (d) continuing to operate the competing business

and service the diverted clients after Joseph and Elizabeth's separation from Centri.

246.    As a direct and proximate result of Cornerstone's aiding and abetting of Joseph and Elizabeth's breaches of their duty of loyalty, Centri has been damaged in an amount to be determined at trial.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against Cornerstone, and award Centri: (a) compensatory damages; (b) disgorgement of all profits earned by Cornerstone from diverted clients and business opportunities; (c) a full accounting of Cornerstone's revenue and profits since its formation; (d) punitive damages; (e) prejudgment and post-judgment interest; and (f) such other and further relief as this Court deems just and proper.

**COUNT X**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS**
**(Centri v. Cornerstone)**

247.    Centri reincorporates and realleges the allegations contained in paragraphs 1-161 of the Complaint.

248.    As set forth in Counts II and III, Centri had valid, enforceable contracts with Joseph and Elizabeth – specifically, the Offer Letters dated August 8, 2022 and August 2, 2022, respectively.

249.    The Offer Letters contain enforceable non-solicitation provisions pursuant to which Joseph and Elizabeth agreed, during their employment and for two years thereafter, not to "directly or indirectly, solicit or accept the business of

any agent, Client or Customer of [Centri] or any known potential client of [Centri] with respect to services similar to those provided by [Centri]."

250. The Offer Letters, together with the Confidentiality Agreements, also contain the confidentiality obligations, which are valid and enforceable contractual provisions under Florida law.

251. Cornerstone had actual knowledge of Centri's contracts with Joseph and Elizabeth, including the non-solicitation provisions contained in the Offer Letters, as well as the confidentiality obligations.

252. Cornerstone was formed, owned, and operated by Joseph and Elizabeth, who had direct personal knowledge of their own contractual obligations to Centri, including the two-year non-solicitation restrictions in their respective Offer Letters and the confidentiality obligations.

253. Cornerstone intentionally and unjustifiably interfered with Centri's contractual rights under the Offer Letters and the Confidentiality Agreements by inducing, facilitating, and enabling Joseph and Elizabeth to breach their non-solicitation obligations and the confidentiality obligations, including by: (a) serving as the vehicle through which Joseph and Elizabeth solicited and accepted business from Centri clients, including Client A, Client B, and Client C, in direct violation of the non-solicitation provisions, and which Joseph and Elizabeth continue to do through today; (b) entering into an engagement agreement with Client A while Joseph and Elizabeth remained bound by their non-solicitation obligations; (c) accepting and profiting from business diverted from Centri in

violation of Joseph and Elizabeth's contractual commitments; (d) continuing to service clients solicited and accepted in breach of the non-solicitation provisions after Joseph and Elizabeth's separation from Centri; and (e) obtaining, possessing, using, copying, and/or disclosing confidential information and Trade Secrets.

254. Cornerstone's interference was intentional, improper, and without justification because it was specifically designed to facilitate Joseph and Elizabeth's breaches of their contractual non-solicitation obligations to Centri, as well as the confidentiality obligations.

255. As a direct result of Cornerstone's inducement and facilitation, Joseph and Elizabeth breached their non-solicitation obligations under the Offer Letters, as well as the confidentiality obligations, causing Centri to lose clients, revenue, profits, and the benefit of its contractual bargain.

256. As a direct and proximate result of Cornerstone's tortious interference with Centri's contractual rights under the Offer Letters, as well as the confidentiality obligations, Centri has been damaged in an amount to be determined at trial, including but not limited to the loss of the benefit of the non-solicitation covenants, lost revenue from diverted clients, damage to Centri's goodwill and client relationships, and the diminution in value of Centri's restrictive covenant protections.

**WHEREFORE**, Centri respectfully requests that this Court enter judgment in its favor and against Cornerstone, and award Centri: (a) compensatory damages; (b) disgorgement of all profits earned by Cornerstone from clients solicited or

accepted in violation of the non-solicitation provisions of Joseph's Offer Letter dated August 8, 2022 and Elizabeth's Offer Letter dated August 2, 2022; (c) a full accounting of all revenue and profits from Client A, ProMedView, and any other clients acquired through Cornerstone's tortious interference; (d) punitive damages; (e) permanent injunctive relief prohibiting Cornerstone from further interfering with Centri's contractual rights under Joseph's Offer Letter dated August 8, 2022 and Elizabeth's Offer Letter dated August 2, 2022, as well as the confidentiality obligations; (f) prejudgment and post-judgment interest; and (g) such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Centri hereby demands a trial by jury on all issues so triable.

[SIGNATURE PAGE FOLLOWS]

Date: July 23, 2026

Respectfully submitted,

By: */s/ Jonathan P. Hart*
**Jonathan P. Hart, Esq.**
Lead Counsel
Florida Bar No. 55982
**Geoffrey L. Travis, Esq.**
Florida Bar No. 988812
**SHUTTS & BOWEN, LLP**
City Place Tower
525 Okeechobee Blvd.
Suite 1100
West Palm Beach, FL 33401
Tel: (561) 835-8500
Fax: (561) 822-5509
Email: JHart@shutts.com
Email: GTravis@shutts.com

**Marc B Cytryn, Esq.**
*Pro Hac forthcoming*
**Aislinn E. Sroczynski, Esq.**
*Pro Hac forthcoming*
**ROYER COOPER COHEN BRAUNFELD LLC**
Three Logan Square
1717 Arch Street
Suite 4700
Philadelphia, PA 19103
Tel: (484) 362-2620
Fax: (484) 362-2630
Email: mcytryn@rccblaw.com
Email: asroczynski@rccblaw.com

*Attorneys for Plaintiff, Centri Business Consulting, LLC*

MIADOCS 31888572 1 62000.0001

- 55 -